BARRETT *v.* STATE.

(*Nashville*, December Term, 1949.)

Opinion filed April 29, 1950.

CUMMINGS & MELTON, of Woodbury, for plaintiff in error.

NAT TIPTON, Assistant Attorney General, for the State.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error has appealed from a conviction of robbery, his maximum punishment being fixed at not more than seven years in the penitentiary. The judgment of the trial court will be corrected by fixing the sentence at not less than five years and not more than seven years imprisonment.

Counsel for the plaintiff in error has filed numerous assignments of error, accompanied by an elaborate brief, to which we have given careful consideration. We will not consider the assignments separately and in their numerical order, but as general factual issues as they appear on the counsel's brief, as well as legal questions which involve his right to a fair and impartial trial.

William J. Barrett is a young man, twenty-four (24) years of age and resides at Woodbury in Cannon County. By his own admissions his record for good citizenship is by no means exemplary. At the same time he is entitled to the same protection in the courts of this State

as the law affords to every other citizen. Prior to his conviction in the present case he had been convicted of the crime of larceny. Notwithstanding this fact several of his acquaintances testified that he had a good character.

On the morning of June 3, 1948, he was in Murfreesboro, Tennessee, and, according to the testimony of several State's witnesses, he went to the beer parlor of one Carney Handley, which was situated about a mile and a half from town, and perpetrated the crime for which he now stands convicted. The State's theory is that he robbed Charlie Richards, an employee of Handley, and also robbed Handley, taking $37.00 from Richards and about $390.00 from Handley. The principal question of fact is the identity of the plaintiff in error. He attempted to disguise himself by using yellow sun glasses and having a red bandanna handkerchief over the lower part of his face. Richards testified at the trial that he was excited by being held up; the robber was about the size of Barrett and he recognized his voice. (He seems to have talked to Barrett at the time of the robbery.) Handley identified him by his eyes. He claimed to have seen him in his place before but could not call his name. A short time before the robbery a beer truck drove up to the place and a Negro, named Brame, a helper on the truck, went to an outhouse and when he opened the door he saw a man who he identified as the plaintiff in error. He was very positive in his identification, describing his hat and clothes; he later saw him at the jail and was positive he was the same man he saw in the outhouse immediately before the robbery.

Following the robbery, according to the State's proof, Barrett fled from the scene in Handley's automobile to

Murfreesboro where he hired a taxicab to take him to Manchester, paying therefor the sum of $9.00. The driver of the taxicab identified Barrett as the man he drove to Manchester and who requested him to drive at a very excessive speed. Upon reaching the outskirts of town he alighted from the taxicab and threw something over the bridge which crossed Duck River. The articles thus thrown away were later identified as a purse belonging to Handley, and also a hat which plaintiff in error was wearing, or had worn; it was a light green hat and similar to the one he had worn. He hired another taxicab at Manchester, paying the driver $5.00, and proceeded to his home in Woodbury, where he was later arrested by a police officer. The plaintiff in error admitted hiring the cab to go to Manchester and stopping at the bridge; and later going on home in another cab, but contended he had been no where near Handley's place and that he went to Manchester to gamble; that he got out of the cab at the bridge but threw nothing away. He also pleaded an alibi, claiming that he was in Woodbury at the time of the robbery. There are other undisputed incriminating facts and circumstances which point strongly to Barrett's guilt.

We deem it unnecessary to further discuss the facts, and especially the evidence offered on behalf of the plaintiff in error. The jury discredited entirely the defense, and under our opinion in *Turner* v. *State,* 188 Tenn. 312, 219 S. W. (2d) 188, the case cannot be reversed merely because the jury chose to accredit the witnesses for the State.

Whether or not the plaintiff in error was sufficiently identified as the person who committed this crime was a jury question. The contention is made on his

behalf that the identifying witnesses were improperly questioned as to his appearance after he had been placed under arrest and while in jail awaiting trial. The colored man, Richard Brame, who first saw him in the outhouse behind Handley's place, stated that he wore a light colored hat and a dark blue army shirt, etc. Defendant's counsel strenuously objected to the arresting officers having him wear a hat at the jail when Richard Brame was observing him for the purpose of confirming his opinion that he was the same man he had seen in the rest room at Handley's. The argument is made that the plaintiff in error was thereby compelled to give evidence against himself, which was in violation of his constitutional rights.

The case chiefly relied on by plaintiff in error is *Stokes* v. *State*, 64 Tenn. 619, 30 Am. Rep. 72, where the defendant was compelled to put his foot in a pan of mud in the presence of the jury and thus allow the jury to compare his footprint with a track found near the scene of the alleged crime. This was held to be error. But in the instant case nothing of this kind took place in the presence of the jury. Nor do we think any unfair advantage was taken of the accused by placing a hat on his head at the time the witness, Brame, observed him. His dress was not the same as it was at the time of the robbery and Brame thought "the hat was a little too big for him". The method of identification, as being in violation of his constitutional immunity from self-incrimination, is discussed by Dean Wigmore as follows: ". . . if, in other words, it (the constitutional inhibition) created inviolability not only for his physical control of his own vocal utterances, but also for his physical control in whatever form exercised, then it would be pos-

sible for a guilty person to shut himself up in his house, with all the tools and indicia of his crime, and defy the authority of the law to employ in evidence anything that might be obtained by forcibly overthrowing his possession and compelling the surrender of the evidential articles,—a clear '*reductio ad absurdum.*' '' Wigmore on Evidence, 3d Ed., Section 2263, p. 363.

''Unless some attempt is made to secure a communication, written or oral, upon which reliance is to be placed as involving his consciousness of the facts and the operations of his mind in expressing it, demand made upon him is not a testimonial one.'' Wigmore on Evidence, 3d Ed., Section 2265, p. 375.

The cases cited in support of the text are numerous and there are many to the contrary. We think, however, that modern authority supports the ruling of the trial court in the instant case. One of the leading cases cited, and which is relied on by the State, is *Ross* v. *State,* 204 Ind. 281, 182 N. E. 865, 868, wherein for pre-trial identification the accused was required to have a handkerchief over his face and a beard of several days growth, this being the appearance of the person who held up the bank. The Court ruled that the defendant ''was [not] 'being used for the purpose of self-incrimination' '' and in violation of the constitution. Other cases to the same effect are *Holt* v. *U. S.,* 218 U. S. 245, 31 S. Ct. 2, 54 L. Ed. 1021, 20 Ann. Cas. 1138, opinion by Mr. Justice Holmes; *U. S.* v. *Cross,* 20 D. C. 365, 382, 9 Mackey 365, 382; *Orr* v. *State,* 236 Ala. 462, 183 So. 445; *People* v. *Clark,* 18 Cal. (2d) 449, 116 P. (2d) 56; *State* v. *Bazemore,* 193 N. C. 336, 137 S. E. 172; *State* v. *Barela,* 23 N. M. 395, 168 P. 545, L. R. A. 1918B, 844.

In *Ross* v. *State, supra,* the Supreme Court of Indiana in discussing the privilege against self-incrimination, said: "The essence of the privilege is freedom from testimonial compulsion", noting that there is a distinction between "compulsory self-incrimination" and compulsory submission to treatment which furnishes evidence for the purpose of identification. Most, if not all, cases involving "compulsory self-incrimination" limit the privilege against self-incrimination to "testimonial compulsion", i. e., a defendant cannot be required to be a witness in his own trial, nor can any other person testify under such circumstances that he is a mere "mouthpiece" of the defendant; the defendant being the "real witness".

In *Holt* v. *U. S., supra,* a question arose as to whether or not a blouse belonged to a prisoner. A witness testified that the prisoner put it on "and it fitted him" [218 U. S. 245, 31 S. Ct. 6]. In holding the evidence admissible Mr. Justice Holmes said: "The objection in principle would forbid a jury to look at a prisoner and compare his features with a photograph in proof." "But the prohibition of compelling a man in a criminal court to be a witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."

In *People* v. *Breen,* 192 Mich. 39, 158 N. W. 142, 143, shoes of the defendant were taken by an officer for the purpose of comparing them with footprints. The officer testified, "they seemed to fit . . . the footprints". The testimony was held not self-incriminating. To the same effect, *Magee* v. *State,* 92 Miss. 865, 46 So. 529; *State* v. *Fuller,* 34 Mont. 12, 85 P. 369, 8 L. R. A., N. S., 762, 9

Ann. Cas. 648; *Krens* v. *State*, 75 Neb. 294, 106 N. W. 27; *Thornton* v. *State*, 117 Wis. 338, 93 N. W. 1107, 98 Am. St. Rep. 924. In an early Nevada case, *State* v. *Ah Chuey*, 1879, 14 Nev. 79, 33 Am. Rep. 530, the defendant was compelled to exhibit his arm so as to show certain tattoo marks. The Court held it was not a violation of privilege; that "no evidence of physical facts can be held to be within the privilege".

We are of opinion that the privilege contended for in the instant case would deprive an arresting officer of testifying as to articles found upon a prisoner which would afford convincing evidence of his guilt of the crime charged against him. Nor could he testify as to "fingerprints" of the accused as resembling pictures of fingerprints taken from objects in a place that had beeen robbed.

■ We find no merit in the assignment that the court erred in permitting the prosecution to make a diagram upon the floor of the court room of the building in which the robbery was committed. Such a diagram could easily have been copied upon paper and included in the bill of exceptions.

■ Contention is made that it was error to permit Handley and others to testify as to details of the crime against him. The robbing of Handley was perpetrated by the same criminal who robbed Richards and at the same time. The testimony was clearly competent as part of the *res gestae.*

■ There is no merit in the assignment of error that officer Vance, upon arresting plaintiff in error on the afternoon of the robbery, had no right to search him. The evidence in Vance's possession fully justified the arrest and the search was permissible under all our au-

thorities. It was not unlawful even though the officer had no warrant for his arrest. *Eanes* v. *State*, 25 Tenn. 53, 44 Am. Dec. 289; *Jones* v. *State*, 161 Tenn. 370, 33 .S. W. (2d) 59; *Wilson* v. *State*, 79 Tenn. 310, 314.

     The next assignment is that the District Attorney General asked the plaintiff in error if he had not broken into a certain store building in Murfreesboro. The question was not answered. But it was a proper inquiry as to *his guilt* of that crime, not a mere accusation, and was admissible as reflecting upon his credibility.

     Contention is made in another assignment that the trial judge should have adjourned the court to enable the plaintiff in error to secure the attendance of one Hibdon, who lived in Cannon County, and would have contradicted the prosecutor Richards. The same contention applies to the absence of another witness by the name of Spence who was a resident of Murfreesboro. The application for an adjournment, or a recess, of the court rested within the discretion of the trial judge. There was no motion made for an attachment of these witnesses; nor does it appear that their attendance could not have been secured by an instanter subpoena for that day.

     The assignment of error that the trial judge refused a special request does not constitute reversible error, because it is argumentative as to the weight to be given identifying testimony.

     The trial judge was not in error in failing to charge the jury relative to the crime of larceny. *Powers* v. *State*, 117 Tenn. 363, 372, 97 S. W. 815.

All assignments of error are overruled and the judgment of the trial court is affirmed with the modification as to the sentence of imprisonment.

All concur.